**Warren CHASE**

v.

**Phlonda PEAY, et al.**

No. CIV.A. CCB–98–2367.

United States District Court,
D. Maryland.

Sept. 30, 2003.

J Joseph Curran, Jr, Baltimore, MD, Angela M Eaves, State of Maryland Office of the Attorney General, Baltimore, MD, Sharon Stanley Street, State of Maryland Office of the Attorney General, Environmental Crimes Unit, Baltimore, MD, for defendants.

James Edward Weaver, Venable Baetjer and Howard, LLP, Baltimore, MD, for plaintiff.

## MEMORANDUM

BLAKE, District Judge.

The defendants, Phlonda Peay, et al. ("defendants"), have moved for summary judgment against the plaintiff, Warren Chase ("plaintiff" or "Chase").[1] The issues in this motion have been fully briefed and no hearing is necessary.[2] Local Rule 105.6. For the reasons stated below, the motion for summary judgment will be granted.

## BACKGROUND

Chase alleges that the defendants, employees of the Maryland Division of Correction, subjected him to cruel and inhuman conditions and used excessive force against him during Chase's confinement at the Maryland Correctional Adjustment Center ("MCAC"), the state's Super–Maximum facility in Baltimore, Maryland. (Am.Compl.) Chase commenced this suit pursuant to 42 U.S.C. § 1983, alleging that the defendants' conduct violated his Eighth and Fourteenth Amendment rights. (*Id.*) Chase sought monetary and punitive damages and costs, naming the various defendants in their individual capacities.[3] (*Id.*)

---

1. The defendants filing for summary judgment are Benson Bell, George Braxton, Eness Brown, Rodney Byrd, Thomas Carter, Thomas Corcoran, Frank Delbridge, Amahl Foster, Charles Graham, Keith Harris, Bernard Jones, Jack Kavanagh, Nicole Knox, Samuel Lee, David McKoy, Vincent Moore, Eric Nelson, Phlonda Peay, Ernest Potee, Jr., Jehu Ragins, David Roane, Daryl Robinson, Deborah Shifflett, William Sondervan, Ronald Tolbert, Denise White, and Vanessa Willis.

2. The court sincerely appreciates the pro bono work done by appointed counsel.

3. The plaintiff's Amended Complaint also sought injunctive relief, naming the same individuals, as well as Thomas R. Corcoran and William W. Sondervan, in their official capacities. (Am. Compl. at ¶ 5) In his memorandum, Chase clarified that he is no longer pursuing injunctive relief, and therefore he will not contest dismissal of Corcoran and Sondervan as defendants. (Pl.'s Opp. Mem. at 29.)

Chase's allegations focus on two incidents, the first occurring on March 1, 1998, while Chase was housed in cell # 2 of the B-pod housing unit at the MCAC. (Pl.'s Opp. Mem. at Ex. 1, Chase Aff., at ¶ 2.) On the morning of March 1, Chase alleges that he was subjected to a strip search and a search of his cell. (*Id.* at ¶ 5; *see also id.* at Ex. 2, Thompson Dep., at 16, 251–53.) Chase states that he then was placed in a three-piece restraint, which remained on him for almost eight hours. (*Id.* at Ex. 1, Chase, Aff., at ¶ 5, 8; *see also id.* at Ex. 2, Thompson Dep., at 19, 114–15.) The three-piece restraint consisted of a chain around Chase's waist, connected to leg irons and handcuffs via a heavy black box. (*Id.* Ex. 1, Chase Aff., at ¶ 6; *id.* at Ex. 2, Thompson Dep., at 19.)

Chase states that he complained to correctional staff that the restraints were too tight and asked that the restraints be removed so that he could go to the bathroom, but the staff did not respond. (*Id.* at Ex. 1, Chase Aff., at ¶¶ 6, 10; *see also id.* at Ex. 2, Thompson Dep., at 16–17, 20, 118–22, 144–45, 150–51, 190, 255–57.) Chase charges that the restraints were so tight that they cut off the circulation in his wrists and ankles, causing numbness, pain, and discomfort in his hands and feet. (*Id.* at Ex. 1, Chase Aff., at ¶ 10.) Chase states that around 2:00 p.m. he was forced to defecate on himself, and that he remained in the restraints with feces on him for almost four more hours. (*Id.* at Ex. 1, Chase Aff., at ¶ 13; *see also id.* at Ex. 2, Thompson Dep., at 187–88.) Chase also states that on this same day the correctional staff on the B-pod refused to give him breakfast, although serving food trays to all of the other prisoners on the unit, on the orders of the officer in charge of the unit. (*Id.* at Ex. 1, Chase Aff., at ¶¶ 3–4, 9, 11; *see also id.* at Ex. 2, Thompson Dep.,

at 15–17, 100–01, 243–44, 250–51, 259–61, 280–84.)

Chase alleges similar conduct by correctional staff during a second incident, covering June 1 through June 8, 1998. Chase attempted to commit suicide on the evening of June 1, by ingesting a large number of pills.[4] (*Id.* at Ex. 1, Chase Aff., at ¶ 15.) Official records from the MCAC indicate that Chase expressed suicidal thoughts to several doctors at the prison during this period. (Defs.' Mem. at Ex. 1, at 12–14, 47–48, 49–52.) Chase was examined by psychiatrists on June 1 and then taken to the cadre isolation area, where he was stripped, dressed in a full-length gown, and placed in a restraint consisting of handcuffs, a black box, a waist chain, a padlock, and leg irons. (Pl.'s Opp. Mem. at Ex. 1, Chase Aff., at ¶¶ 16–17.) Chase remained in the cadre isolation area for eight days, until June 8. (*Id.* at ¶ 17.) Dr. Joseph S. Fuhrmaneck, a psychologist at the MCAC, testified that placing Chase in the cadre isolation area was a behavioral management strategy to prevent Chase from destroying property or otherwise acting out aggressively. (Defs.' Mem. at Ex. 3, Fuhrmaneck Dep., at 61–63.) Dr. Edouard, a psychologist at the MCAC, similarly testified that patients would be placed in restraints in the cadre isolation unit in order to prevent them from harming themselves or others. (Defs. Mem. at Ex. 6, Edouard Dep., at 49.)

During his time in isolation, Chase alleges that he was forced to defecate on himself three times, because correctional staff would not remove the restraints to allow Chase to use the bathroom. (Pl.'s Opp. Mem. at Ex. 1, Chase Aff., at ¶¶ 19, 21, 28, 31.) Chase states that on multiple occasions during this eight-day period he was unable to eat his food, because the correc-

---

4. Chase's suicide attempt was in reaction to learning that a man whom he had considered a brother, Orlando Jenkins, had died. (Pl.'s Opp. Mem. at Ex. 1, Chase Aff., at ¶ 15.)

tional staff did not bring him a food tray at meal times, or refused to remove his restraints to allow him to eat his food. (*Id.* at ¶¶ 20–26, 28–32.) Chase also alleges that he was told on several occasions between June 1 and June 8 that he had to remain in full restraints all the time while he was in the cadre isolation unit. (*Id.* at ¶¶ 24, 27.) James Kavangh, formerly the Warden at MCAC, testified that it would be inappropriate to leave a prisoner in restraints all day long, and that restraints generally must be loosened or removed for a prisoner to eat or go to the bathroom. (Defs.' Mem. at Ex. 5, Kavanagh Dep., at 35, 36–37, 73–75.)

Official records from the MCAC show that Chase was disciplined for an incident on the morning of March 1, 1998, in which he refused to remove his arm from his feeding slot, and disobeyed an officer's order to remove his arm. (Defs.' Mem. at Ex. 1, at 1–5.) These records also show that Chase made several complaints during the period of June 1998 that members of the prison staff were putting things in his food and trying to poison him. (Defs.' Mem. at Ex. 1, at 12, 18, 47; *see also id.* at Ex. 3, Chase Dep., at 42–43; *id.* at Ex. 5, Kavanagh Dep., at 16.) Notes from the cadre unit for Chase's confinement between June 1 and June 8, 1998 include notations that he was using the bathroom at various times, that his restraints were removed at various times, and daily notations that he was eating his meals. (*Id.* at Ex. 4, Willis Dep., at Ex. 3.) The notes also indicate that on three occasions Chase refused to have his restraints removed so that he could eat, and that on one occasion he refused to accept his food. (*Id.*) Chase testified that he never refused meals or refused to have restraints removed while he was in isolation. (*Id.* at Ex. 3, Chase Dep., at 41.) Finally, the cadre unit notes indicate that Chase was visited by medical and psychological staff while in isolation,

and that Chase continued to express suicidal thoughts. (*Id.*)

Chase filed this suit on July 22, 1998, at which time he remained a prisoner at MCAC. (Pl.'s Opp. Mem. at Ex. 1, Chase Aff., at ¶ 1.) Chase was released from his term of incarceration on or about July 8, 2002, after completing his ten-year sentence. (*Id.*)

## ANALYSIS

### I.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240 (4th Cir.1988). The court must "view the facts and draw reasonable inferences

in a light most favorable to the nonmoving party," *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.), *cert. denied,* 513 U.S. 813, 115 S.Ct. 67, 130 L.Ed.2d 24 (1994), but it also must abide by its affirmative obligation to ensure that factually unsupported claims and defenses do not proceed to trial. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## II.

█ The Prison Litigation Reform Act ("PLRA") generally requires prisoner plaintiffs to exhaust administrative remedies before filing suit in federal court:

No action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Thus, the exhaustion provision plainly extends to Chase's allegations of excessive force and cruel and inhuman conditions.

It is undisputed that Chase was confined in MCAC when he filed his original complaint in this case, on July 22, 1998, and when he filed his amended complaint on May 25, 2000. On both of these dates, therefore, Chase was a "prisoner" within the meaning of 42 U.S.C. § 1997e(a), and was subject to the PLRA's exhaustion requirement. It also is undisputed that Chase was released from MCAC on or about July 8, 2002.[5] In his memoranda, Chase now argues that the PLRA no longer applies to his lawsuit, because he no longer is a prisoner within the meaning of 42 U.S.C. § 1997e(a). (Pl.'s Opp. Mem. at 18; Pl.'s Suppl. Opp. Mem. at 2–4.)

Although the Fourth Circuit has not yet considered this question, other circuits of the Court of Appeals have held that the administrative exhaustion requirement under the PLRA continues to apply when a prisoner is released while his lawsuit still is pending in federal court. *See Cox v. Mayer,* 332 F.3d 422, 425 (6th Cir.2003); *Ahmed v. Dragovich,* 297 F.3d 201, 210 (3d Cir.2002); *Dixon v. Page,* 291 F.3d 485, 488–89 (7th Cir.2002); *cf. Page v. Torrey,* 201 F.3d 1136, 1140 (9th Cir.2000) (applying § 1997e(a) to the plaintiff's status at the time of filing and holding that a former prisoner is not subject to the exhaustion requirement if he has been released at the time of filing); *Greig v. Goord,* 169 F.3d 165, 167 (2d Cir.1999) (per curiam) (same).[6] In an en banc opinion, the Eleventh Circuit has held that nearly identical language under the PLRA's physical injury require-

---

**5.** Counsel for the plaintiff has informed the court that Chase has been confined again on new charges. Because the applicability of the PLRA turns on the date of the filing of the plaintiff's lawsuit rather than his present status of confinement, this change in circumstances does not affect the analysis in this case.

**6.** The Fourth Circuit has held the special provisions under the PLRA for a prisoner pro-

ceeding in forma pauperis no longer apply once a prisoner plaintiff is released, and that the plaintiff then may proceed under the in forma pauperis provisions applicable to nonprisoners. *See DeBlasio v. Gilmore,* 315 F.3d 396, 398–99 (4th Cir.2003). This issue is distinguishable because the in forma pauperis provisions involve a continuing obligation, whereas the plain language of the exhaustion requirement indicates that it is to be applied and determined at the time of filing.

ment, 42 U.S.C. § 1997e(e),[7] continues to apply in situations in which the prisoner plaintiff has been released from prison after filing suit. *See Harris v. Garner*, 216 F.3d 970, 973–74 (11th Cir.2000) (en banc), *cert. denied*, 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001); *cf. Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir.1998) (applying § 1997e(e) to the plaintiff's status at the time of filing and holding that a former prisoner is not subject to the physical injury requirement if he has been released at the time of filing). These rulings are consistent with the plain language of the PLRA, which focuses on the time that a lawsuit is "brought" in federal court, indicating that the applicability of the exhaustion requirement must be determined at the time of filing. *See Cox*, 332 F.3d at 424–25 (concluding that a suit is "brought" under 42 U.S.C. § 1997e(a) when it is filed); *cf. Harris*, 216 F.3d at 973–74 (concluding that the term "brought" under a similar provision of the PLRA refers to the timing of bringing a suit, which means the action of filing the suit). Chase's subsequent release from prison therefore has no bearing on his obligation to exhaust administrative remedies.[8]

For the same reasons, Chase is also incorrect to suggest that the administrative exhaustion requirement cannot be applied to his case, because he no longer falls

under the jurisdiction of the Maryland Division of Correction, and therefore the state's prisoner grievance processes are no longer "available" to him as required under the PLRA. (Pl.'s Opp. Mem. at 18.) The critical question is not whether the Maryland prisoner grievance process currently is available to Chase, but rather whether those remedies were available to him on July 22, 1998, at the time when he filed this suit in federal court. *See Cox*, 332 F.3d at 424–25 (focusing on the administrative remedies that were available to the plaintiff before he filed suit); *Dixon*, 291 F.3d at 488–89 (affirming the dismissal of a suit by a prisoner who had since been released, though conceding that administrative remedies were not currently available to him). When Chase filed this suit in federal court on July 22, 1998, he was confined at MCAC and the administrative remedies provided through Maryland's Division of Correction were available to him. Consequently, Chase's claims must be dismissed, unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA, or that the defendants have forfeited their right to raise non-exhaustion as a defense.

■ Chase has not presented any evidence to demonstrate that he has fulfilled the PLRA's exhaustion requirement with respect to the incidents that he alleges occurred on June 1 through June 8, 1998.[9]

---

7. That provision reads: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

8. In his supplemental memorandum, Chases cites two unpublished district court opinions and an unpublished Magistrate Judge's Report and Recommendation that have reached the opposite result on this same question: *Dennison v. Prison Health Services*, No. 00–266–BS, 2001 WL 761218 (D.Me. July 6, 2001), *Murphy v. Magnusson*, No. 98–439–PC, 1999 WL 615895 (D.Me. July 27, 1999), and, Report and Recommendation of Magistrate

Judge Charles B. Day, *Talal v. Murray*, No. Civ. 99–432–AW (D.Md. May 24, 2002). (Pl.'s Suppl. Opp. Mem. at 2–3). While these opinions may well represent a sensible and practical approach to this issue, unfortunately they are against the clear weight of current published authority. I agree with Judge Day, however, that the issues of unfair surprise and prejudice must be considered in connection with the timing of the defendants' assertion of the non-exhaustion defense.

9. Chase states that he recalls filing a request for an administrative remedy regarding this incident, but he believes that his only copy was filed with the court in a predecessor

Therefore, all claims related to the incidents occurring between June 1 and June 8, 1998 must be dismissed for failure to exhaust.

■ With regard to the March 1, 1998 incident, Chase argues that he has satisfied the exhaustion requirement, and therefore is entitled to proceed on this claim. (Pl.'s Opp. Mem. at 19–20.) On March 3, 1998, Chase filed a request for administrative remedy with the Warden of MCAC regarding an incident that occurred on February 28, 1998, as well as the incident described above that occurred on March 1, 1998. (Pl.'s Mem. at Ex. 1, Chase Aff., at Ex. A.) On March 11, the MCAC's Institutional Coordinator dismissed Chase's request, pending resubmission, because Chase had failed to submit separate complaint forms for each incident, as the "Instructions to Inmates for Completing Request for Administrative Remedy" that were attached to the form had instructed him to do. (*Id.*) On April 7, Chase filed an Appeal of Administrative Dismissal with the Commissioner of Correction, challenging the March 11 dismissal. (*Id.* at Ex. B.) On April 15, the Maryland Division of Correction Headquarters Coordinator summarily denied the appeal, stating simply that Chase had failed to

follow the prior instructions for resubmission. (*Id.*)

When Chase received the April 15 denial of his appeal, it appears that there were at least two administrative options still available to him. Chase could have resubmitted his request for an administrative remedy for the March 1 incident to the Warden of the MCAC, this time complying with the requirement to submit a separate remedy for each incident. (*Id.* at Ex. B.) Alternatively, Chase could have appealed the Commissioner of Correction's decision to the Inmate Grievance Office ("IGO"), the final level of appeal within Maryland's administrative grievance system for prisoners. *See* Md.Code Ann. Corr. Serv. § 10–206 (describing the process for submitting grievances to the IGO and the administrative exhaustion requirement); *id.* & 10–210 (allowing judicial review of a final decision from the IGO in state courts); Md. Regs. Code tit. 12 § 07.01.03 (stating that prisoners must exhaust available administrative remedies within the Division of Correction before appealing to the IGO).[10] Instead, Chase chose not to pursue further relief through the administrative remedy process.

action. (Pl.'s Opp. Mem. at Ex. 1, Chase Aff., at ¶ 34.) Without additional evidence or more specific facts, this generalized allegation is insufficient to demonstrate administrative exhaustion under the PLRA and avert summary judgment. In any event, filing the initial request without proceeding to the other levels of review would not be sufficient.

10. The grievance forms attached to the plaintiff's memorandum indicate that filing a Request for Administrative Remedy with the Warden of the Institution where the prisoner is incarcerated is the first of three steps in the administrative remedies process provided by the Maryland Division of Correction to its prisoners. (Pl.'s Mem. at Ex. 1, Chase Aff., at Ex. A.) If this Request is denied, it appears that the prisoner has ten calendar days to file

an appeal with the Commissioner of Correction. (*Id.* at Exs. A, B.) If this Appeal is denied, it appears that the third and final option available to the prisoner is to file an appeal within 30 days with the Executive Director of the Inmate Grievance Office ("IGO"). (*Id.*)

Neither party introduced any further evidence about the administrative remedy procedures available within the Division of Correction. It is clear, however, that under Maryland law the prisoner's final option is to file a complaint with the IGO, which can be done only after all administrative remedies available within the Division of Correction have been exhausted. *See* Md.Code Ann. Corr. Serv. §§ 10–206, 10–210; Md. Regs.Code tit. 12 § 07.01.03.

The exhaustion requirement under the PLRA has been interpreted to require prisoners to pursue administrative grievances until they receive a final denial of their claim, appealing through all available stages in the administrative process. *See, e.g., Gibbs v. Bureau of Prison Office,* 986 F.Supp. 941, 943–44 (D.Md.1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where the plaintiff did not appeal his administrative claim through all four stages of the Bureau of Prisons' grievance process); *Booth v. Churner,* 532 U.S. 731, 735, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) (affirming dismissal of prisoner's claim for failure to exhaust because he "never sought intermediate or full administrative review after the prison authority denied relief"); *Thomas v. Woolum,* 337 F.3d 720, 726 (6th Cir.2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level") (internal quotations omitted); *Pozo v. McCaughtry,* 286 F.3d 1022, 1024 (7th Cir.) (stating that a prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review), *cert. denied,* 537 U.S. 949, 123 S.Ct. 414, 154 L.Ed.2d 293 (2002). To satisfy this requirement, Chase would need to demonstrate that he appealed his grievance all the way to the IGO, either directly following the denial of his administrative complaint, or after having resubmitted his complaint to the Warden of the MCAC and pursued the claim through all three steps in the administrative process. Because Chase has offered no evidence in support

of such a demonstration, he has not satisfied his obligation to go beyond "mere allegations" and "set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers,* 840 F.2d at 240. The court must conclude that Chase failed to exhaust "such administrative remedies as are available," as required under the PLRA. 42 U.S.C. § 1997e(a).[11]

■ In addition to his statutory arguments, Chase argues that reading the PLRA to require him to exhaust administrative remedies violates his right to seek redress for Eighth Amendment violations. Because decisions by the IGO have preclusive effect, he contends, requiring Maryland prisoners to exhaust their administrative remedies through the IGO deprives them of a federal forum for their claims. (Pl.'s Opp. Mem. at 19–20.) The history and plain language of the PLRA, however, suggest that decreasing the number of federal suits is precisely the kind of result that Congress intended. The administrative exhaustion requirement serves an important function by preserving for state correctional systems the initial opportunity to redress problems within their own institutions. As the Supreme Court noted in *Porter,* "the PLRA's dominant concern [was] to promote administrative redress, filter out groundless claims, and foster better prepared litigation of claims aired in court." 534 U.S. at 528, 122 S.Ct. 983.[12]

■ Chase also argues that the defendants already have forfeited their right to

11. I do not reach the question of whether administrative remedies are "available" when the plaintiff attempts to exhaust his remedies, but is frustrated in doing so by the actions of prison officials. *See Taylor v. Barnett,* 105 F.Supp.2d 483, 486 (E.D.Va.2000).

12. Because the preclusive effect of IGO proceedings is not at issue here, the court expresses no opinion regarding Chase's suggestion that "[IGO] proceedings are not as full

and fair as is an action brought in a federal forum." (Pl.'s Opp. Mem. at 20 n.4.) The court simply notes that in another District of Maryland case cited by Chase, *Batts v. Lee,* 949 F.Supp. 1229 (D.Md.1996), the court concluded that IGO proceedings, and the subsequent right to challenge the IGO's factual findings, legal conclusions, and any alleged procedural irregularities in the state Circuit Court, provided sufficient process.

invoke the PLRA exhaustion requirement. The defendants first raised the plaintiff's failure to exhaust his administrative remedies as an affirmative defense in their Answer to the Amended Complaint, filed on July 24, 2000.[13] (Answer at 5.) The defendants did not raise this issue in their original Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, filed on January 29, 1999, the first dispositive motion filed by the defendants in this case. In his memorandum, Chase argues that allowing the defendants to raise the non-exhaustion defense in their second Answer, some two years after Chase originally filed suit, and in their Motion for Summary Judgment, some two years after that, would result in unfair surprise and prejudice to the plaintiff.[14] (Pl.'s Opp. Mem. at 18–19.)

■ The main defect in Chase's forfeiture argument is that it overlooks the Amended Complaint Chase himself filed on May 25, 2000. As the Seventh Circuit explained in another prisoner suit where the defendants failed initially to plead the exhaustion defense, "[b]ecause a plaintiff's new complaint wipes away prior pleadings, the amended complaint opens the door for defendants to raise new and previously unmentioned affirmative defenses." *Massey v. Helman,* 196 F.3d 727, 735 (7th Cir.1999), *cert. denied,* 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001); *see also Sidari v. Orleans County,* 174 F.R.D. 275, 283 (W.D.N.Y.1996) ("The plaintiff's filing of the Amended Complaint gives the defendants a new opportunity to respond to the amended complaint, to assert new affirmative defenses . . . ."). The amendments to Chase's complaint in this case were hardly insubstantial. Chase's initial complaint was filed pro se and included a single four-page handwritten factual narrative, whereas the amended version was prepared by counsel and clearly specifies two distinct counts. The original version, it should also be noted, alleged that the plaintiff had filed a prison grievance and administrative appeal (Compl. at 2), whereas the amended version does not. To allow the plaintiff to make such significant revisions without granting the defendants the same opportunity would not comport with Rule 15(a)'s command that leave to amend pleadings "shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). Indeed, that result "would, in essence, enable plaintiffs to change their theory of the case while simultaneously locking defendants into their original pleading." *Massey,* 196 F.3d at 735.

■ Chase's argument also conflicts with the "ample authority" in the Fourth Circuit "for the proposition that absent unfair surprise or prejudice to the plaintiff, a defendant's affirmative defense is not waived." *Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 612 (4th Cir.1999) (citing numerous cases). Over two years elapsed between the filing of the defendants' Answer to the Amended Complaint

---

**13.** As of July 24, 2000 the three-year statute of limitations on Chase's claims had not yet run.

**14.** Chase's argument presumes that non-exhaustion is a waivable affirmative defense to § 1983 claims, rather than a jurisdictional prerequisite. Though the weight of authority indeed favors this view, *see, e.g., Arnold v. Goetz,* 245 F.Supp.2d 527, 534 (S.D.N.Y.2003) (joining the "chorus of voices concluding that an inmate's failure to exhaust administrative remedies in accordance with the PLRA does not divest federal courts of jurisdiction"), and the defendants' Answer to the Amended Complaint in fact pleads non-exhaustion as a defense, the Fourth Circuit has not yet ruled on the characterization of the PLRA's exhaustion requirement. The court need not decide the issue here. As will be explained below, even if non-exhaustion is an affirmative defense that must be pleaded to be preserved, the defendants have not in fact waived or forfeited the argument.

and the present Motion for Summary Judgment, yet Chase never sought to strike the defendants' § 1997e(a) defense. Nor is there any evidence that Chase attempted to complete the administrative process after receiving the defendants' Answer asserting non-exhaustion as a defense. Under these circumstances, Chase cannot have been "surprised" by the defendants' motion, and the court can find no unfair prejudice in allowing the defendants to proceed with the non-exhaustion defense.[15]

## III.

In sum, the defendants have set forth a valid defense under § 1997e(a) based on Chase's failure to exhaust available administrative remedies, and that defense was not forfeited by the defendants' failure to raise it in their initial pleadings, considering that it was raised in an Answer to an Amended Complaint filed well within the statute of limitations. Accordingly, the defendants' Motion for Summary Judgment will be GRANTED in a separate Order following this Memorandum.

## *ORDER*

For the reasons stated in the accompanying Memorandum, it is hereby Ordered that:

1. the Defendants' Motion for Summary Judgment in the above-captioned matter shall be **GRANTED**;

2. the Amended Complaint is Dismissed without prejudice for failure to exhaust available administrative remedies;

3. copies of this Order and the accompanying Memorandum shall be mailed to counsel of record;  and

4. the clerk of the court shall **CLOSE** this case.

---

**15.** This is not a case where a dispositive affirmative defense is raised only after the statute of limitations has run.