**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-7279

SHAIDON BLAKE,

Plaintiff - Appellant,

v.

MICHAEL ROSS, Lt.,

Defendant – Appellee,

and

THE DEPARTMENT OF CORRECTIONS; STATE OF MARYLAND; M.R.D.C.C.; GARY MAYNARD, Sec.; MICHAEL STOUFFER, Comm.; JAMES MADIGAN,

Defendants.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.  Alexander Williams, Jr., District Judge. (8:09-cv-02367-AW)

Argued:  January 27, 2015            Decided:  May 21, 2015

Before TRAXLER, Chief Judge, and GREGORY and AGEE, Circuit Judges.

Reversed and remanded by published opinion.  Judge Gregory wrote the majority opinion, in which Chief Judge Traxler joined. Judge Agee wrote a dissenting opinion.

**ARGUED:** Scott Matthew Noveck, MAYER BROWN LLP, Washington, D.C., for Appellant. Sarah W. Rice, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee. **ON BRIEF:** Reginald R. Goeke, Scott A. Claffee, MAYER BROWN LLP, Washington, D.C., for Appellant. Douglas F. Gansler, Attorney General of Maryland, Dorianne Meloy, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellee.

---

GREGORY, Circuit Judge:

Inmate Shaidon Blake appeals the district court's summary dismissal of his 42 U.S.C. § 1983 claim against Appellee Lieutenant Michael Ross on the ground that Blake failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). Because we hold that Blake reasonably believed that he had sufficiently exhausted his remedies by complying with an internal investigation, we reverse the judgment of the district court and remand for further proceedings.

**I.**

**A.**

Since we are reviewing a grant of summary judgment, the following account frames the facts in the light most favorable to Blake, the non-movant, and draws all reasonable inferences in his favor. Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir. 2009). On June 21, 2007, Ross and Lieutenant James Madigan approached Blake's cell at the Maryland Reception Diagnostic and Classification Center. Madigan ordered Blake to gather his possessions so that he could be moved to another cell block. When Blake asked why he was being moved, Madigan called him a "bad ass" and a "tough guy" and accused him of trying to take over the housing unit.

Ross entered the cell and handcuffed Blake's hands behind his back. When Ross escorted Blake out of the cell and towards the top of the stairs, Madigan reached out and grabbed Blake's arm. Blake told Madigan to "[g]et the fuck off" him. Ross got the impression that there might have been some preexisting tension between Blake and Madigan.

Ross, still holding Blake in an escort grip, led Blake down the concrete stairs with Madigan following closely. As he did so, Madigan suddenly shoved Blake from behind. Blake had to push against the railing with his elbow to keep himself from falling down the stairs. Blake told Madigan not to push him. Ross assured Madigan that he had Blake under control and continued walking down the stairs.

At the bottom of the stairs, Madigan shoved Blake again. Blake told Madigan, "Don't fucking push me no more." When they reached the pod door, Madigan ordered Blake to stand against the wall of the corridor. He then stepped into the pod and spoke with the corridor officer inside. When he returned he was "agitated," and he began "yelling and screaming and pointing in [Blake's] face." J.A. 522-23. With Ross still holding Blake against the wall, Madigan wrapped a key ring around his fingers and then punched Blake at least four times in the face in quick succession. Madigan paused briefly, then punched Blake in the face again.

4

While Ross continued to hold Blake, Madigan ordered Latia Woodard, a nearby officer, to mace Blake. Woodard refused. Ross told Woodard to radio a "Signal 13" - a code to summon other officers for assistance. He and Madigan then took Blake to the ground by lifting him up and dropping him. Ross dropped his knee onto Blake's chest, and he and Madigan restrained Blake until other officers arrived.

The responding officers took Blake to the medical unit; Blake, surrounded by guards and fearful of being attacked again, declined treatment even though he was in pain. He was later diagnosed with nerve damage.

That same day, Blake reported the incident to senior corrections officers and provided a written account. The Internal Investigative Unit ("IIU") of the Maryland Department of Public Safety and Correctional Services ("Department") undertook a year-long investigation and issued a formal report. The report confirmed that Madigan had used excessive force against Blake by striking him in the face while he was handcuffed. The report did not assign any fault to Blake and did not recommend any disciplinary action against him.

**B.**

Blake filed a pro se § 1983 complaint on September 8, 2009 against Ross, Madigan, two supervisors, and three government entities. The district court dismissed sua sponte the claims

5

against the government entities. Ross and the two supervisors filed an answer on November 19, 2009, and moved to dismiss or for summary judgment on February 4, 2010.[1] None of the defendants asserted an exhaustion defense in either the answer or the motion. The district court granted summary judgment as to the supervisors but denied it as to Ross, finding that Blake had presented genuine issues of material fact regarding whether Ross committed a constitutional violation. The court ordered that counsel be appointed to represent Blake.

On August 2, 2011 - nearly two years after filing Ross's answer to Blake's complaint – Ross's counsel contacted counsel for Blake and Madigan and requested consent to file an amended answer. Blake's counsel agreed on the condition that Ross's counsel consent to the filing of an amended complaint at a later date. The parties did not discuss the specific contents of the amended answer, which Blake became aware of for the first time that afternoon when Ross filed his motion to amend. The amended answer included a new affirmative defense alleging that Blake had failed to exhaust his administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a). Less than a day later, without

---

[1] Blake did not successfully serve Madigan until January 26, 2011.

giving Blake any opportunity to object, the district court granted the motion to amend.

Blake moved to strike Ross's exhaustion defense on the ground that it had been waived. While that motion was pending, Blake filed an amended complaint, and Ross reasserted his exhaustion defense in his answer. Blake again moved to strike Ross's exhaustion defense. On January 9, 2012, Ross moved for summary judgment on the ground that Blake had failed to exhaust his administrative remedies. On May 10, 2012, the district court denied Blake's motion to strike and granted summary judgment to Ross and Madigan. Blake filed a motion for reconsideration, in response to which the court reinstated Blake's claim against Madigan (who had not joined Ross's motion), but refused to reinstate his claim against Ross. Blake ultimately prevailed against Madigan at trial. On August 9, 2013, Blake timely appealed the dismissal of his claim against Ross.

## II.

On appeal, Blake argues that 1) Ross waived his exhaustion affirmative defense by failing to assert it in his initial answer or motion for summary judgment, and 2) even if Ross did not waive the defense, Blake exhausted his administrative remedies as required by the PLRA by complying with the IIU

7

investigation. Because we find that Ross's exhaustion defense is without merit, we do not reach the issue of whether he waived the defense.

**A.**

We review de novo the district court's grant of summary judgment, viewing all facts in the light most favorable to the non-movant and drawing all reasonable inferences therefrom in his favor. Pueschel, 577 F.3d at 563. Because an inmate's failure to exhaust administrative remedies is an affirmative defense, Ross bears the burden of proving that Blake had remedies available to him of which he failed to take advantage. Jones v. Bock, 549 U.S. 199, 211-12, 216 (2007); Moore v. Bennette, 517 F.3d 717, 725 (4th Cir. 2008).

**B.**

The PLRA requires an inmate to exhaust "such administrative remedies as are available" before filing an action. 42 U.S.C. § 1997e(a). This requirement is one of "proper exhaustion": an inmate is not excused from the requirement simply because a previously available administrative remedy is no longer available. Woodford v. Ngo, 548 U.S. 81, 93 (2006). However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." Moore, 517 F.3d at 725.

8

The Department provides inmates with a number of administrative avenues for addressing complaints and problems. At issue here is the interaction between two of those processes: the Administrative Remedy Procedure ("ARP"),[2] and the IIU.

The ARP is available for "all types of complaints" except "case management recommendations and decisions," "Maryland Parole Commission procedures and decisions," "disciplinary hearing procedures and decisions," and "appeals of decisions to withhold mail." Maryland Division of Correction, Inmate Handbook 30 (2007) (hereinafter "Handbook"). The ARP involves a three-step process: the inmate files a request for remedy with the warden, then appeals a denial to the Commissioner of Corrections, and finally appeals any subsequent denial to the Inmate Grievance Office ("IGO"). See id. at 30-31; Md. Code Regs. § 12.07.01.05(B); Chase v. Peay, 286 F. Supp. 2d 523, 529 (D. Md. 2003) (describing the process); Thomas v. Middleton, No. AW-10-1478, 2010 WL 4781360, at *3 (D. Md. Nov. 16, 2010) (same).

In addition to the ARP, the Department administers the Internal Investigative Unit, or IIU. The IIU is responsible for investigating, among other things, "allegation[s] of excessive

---

[2] We also briefly discuss the Inmate Grievance Office, which hears appeals from the ARP and rules in the first instance on other grievances, supra.

force by an employee or nonagency employee." Md. Code Regs. § 12.11.01.05(A)(3). Any employee with knowledge of an alleged violation within the scope of the IIU's investigative authority must file a complaint. Id. § 12.11.01.09(A). Alternatively, an inmate may file a complaint directly. Id. § 12.11.01.09(E).

Blake's encounter with Madigan and Ross was investigated by the IIU after Blake immediately reported the incident to senior corrections officers; Blake never filed an administrative grievance through the ARP. Ross contends that the ARP was available to Blake despite his ongoing IIU investigation. Blake argues that the investigation removed his grievance from the ARP process. To resolve this issue, we first examine in greater detail the legal standard Ross must meet to prove his exhaustion defense, and then apply that standard to Blake's situation.

**i.**

The Supreme Court has identified three primary purposes of the PLRA's exhaustion requirement: 1) "allowing a prison to address complaints about the program it administers before being subjected to suit," 2) "reducing litigation to the extent complaints are satisfactorily resolved," and 3) "improving litigation that does occur by leading to the preparation of a useful record." Jones, 549 U.S. at 219. To serve these ends, the Court has interpreted the requirement quite strictly to require "proper exhaustion." Woodford, 548 U.S. at 93.

10

Still, the exhaustion requirement is not absolute. See Moore, 517 F.3d at 725. As Justice Breyer noted in his concurrence in Woodford, administrative law contains "well-established exceptions to exhaustion." 548 U.S. at 103-04 (Breyer, J., concurring). Justice Breyer pointed to the Second Circuit's holding in Giano v. Goord, 380 F.3d 670 (2d Cir. 2004), which applied these well-settled exceptions to the PLRA:

> [T]here are certain "special circumstances" in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless have been justified.

380 F.3d at 676. The court went on to find that the inmate's failure to exhaust available remedies "was justified by his reasonable belief" that no further remedies were available. Id. at 678.

Of course, in reading longstanding administrative law exceptions into the PLRA's exhaustion requirement, the Second Circuit was mindful of the purposes of the PLRA. It therefore developed a two-pronged inquiry: first, whether "the prisoner was justified in believing that his complaints in the disciplinary appeal procedurally exhausted his administrative remedies because the prison's remedial system was confusing," and second, "whether the prisoner's submissions in the disciplinary appeals process exhausted his remedies in a

11

substantive sense by affording corrections officials time and opportunity to address complaints internally." Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (emphasis in original) (alterations and internal quotation marks omitted); see also Johnson v. Testman, 380 F.3d 691, 696-97 (2d Cir. 2004). By requiring both a procedural and a substantive component, the Second Circuit has implemented traditional principles of administrative law in a manner consistent with the purposes of the PLRA's exhaustion requirement. The procedural prong ensures that an uncounseled inmate attempting to navigate the grievance system will not be penalized for making a reasonable, albeit flawed, attempt to comply with the relevant administrative procedures. Meanwhile, the substantive prong safeguards a prison from unnecessary and unexpected litigation. We are persuaded that this formulation strikes the appropriate balance between statutory purpose and our administrative jurisprudence. We therefore adopt the Second Circuit's exception to the PLRA's exhaustion requirement as articulated in Macias and Giano.

**ii.**

Clearly Blake's IIU investigation satisfied the substantive component of the exception to exhaustion discussed above. The Department conducted a one-year investigation into Blake's violent encounter with Madigan and Ross, at the conclusion of which it issued Madigan an Unsatisfactory Report of Service and

12

relieved him of his duties as a corrections officer.[3]  J.A. 375-77.  As the dissent notes, post at 26, the investigation "examine[d] employee conduct," which forms the core of Blake's claim under § 1983.  Furthermore, the dissent's fears that the Department did not have an adequate chance to address potential complaints against Ross, as opposed to Madigan, are unfounded.  Blake did not file a targeted complaint against Madigan, but rather reported the incident as a whole, naming both Madigan and Ross in his account.  J.A. 329-33.  Investigating officers were well aware of Ross's involvement, and they collected testimony regarding his role in the incident from a number of sources, including a statement from Ross himself.  See, e.g., J.A. 289-91, 299-300, 305, 307-11.  The Department certainly had notice of Blake's complaint, as well as an opportunity to develop an extensive record and address the issue internally.

The question remains whether Blake's interpretation of the relevant regulations was reasonable.  Blake had three formal sources of information about the administrative grievance process available to him:  the Handbook, the Maryland Code of Regulations ("the Regulations"), and the Maryland Department of

---

[3] Rather than facing dismissal, Madigan chose to resign. J.A. 566.

13

Correction Directives ("the Directives").[4]  The 2007 version of the Handbook contains approximately one page of information about the ARP and the IGO.  Handbook 30-31.  This page lists "types of complaints" for which the ARP is not available:  "case management recommendations and decisions," "Maryland Parole Commission procedures and decisions," "disciplinary hearing procedures and decisions," and "appeals of decisions to withhold mail."  Id. at 30.  Although this list does not include complaints undergoing internal investigation, it is reasonable to read it as a list of content-based rather than procedural exemptions.  Indeed, the Handbook makes no mention of the IIU or the internal investigation process whatsoever; there is no basis for an inmate to conclude that the ARP and IIU processes would be permitted to proceed concurrently.

The Regulations and the Directives are similarly ambiguous. Only one provision of the Regulations mentions both the ARP and the IIU.  Md. Code Regs. § 12.11.01.05(B).  That provision addresses when an employee involved in the ARP process must

---

[4] Blake testified that he did not read all of the relevant directives.  See J.A. 162-63.  We agree with the dissent that an inmate's ignorance of available procedures is not sufficient to excuse a failure to exhaust remedies.  That is why, for the purposes of the exception we adopt today, we assume that the inmate possessed all available relevant information when determining whether he held an objectively reasonable belief that he had exhausted all available avenues for relief.

14

report an allegation to the IIU, but it says nothing about the disposition of the ARP complaint should the IIU initiate an investigation. And the only directive cited by Ross that mentions both processes is DCD 185-003, which did not take effect until after Blake's encounter with the officers.[5] Therefore, Ross has proffered no evidence that would contradict Blake's belief that the IIU's investigation removed his complaint from the typical ARP process.[6]

---

[5] DCD 185-003, which went into effect on August 27, 2008, makes clear that an ARP complaint will be dismissed for procedural reasons "when it has been determined that the basis of the complaint is the same basis of an investigation under the authority of the Internal Investigative Unit (IIU)," and allows an inmate to appeal that dismissal. Ross argues that this directive proves that Blake could have filed an ARP complaint at the time of the incident. Blake counters that the directive is the first contemplation of a coexistence between the ARP and IIU investigations. Regardless, DCD 185-003 did not exist when the IIU began investigating Blake's complaint, and therefore it is at best tangentially related to whether his belief that he could not pursue an ARP claim was reasonable.

[6] Ross also contends that Blake could have filed a complaint with the IGO in the first instance. The Handbook states that "[t]he IGO reviews grievances and complaints of inmates against the Division of Correction . . . after the inmate has exhausted institutional complaint procedures, such as the Administrative Remedy Procedure." Handbook at 30 (emphasis added). And the Regulations provide that an inmate must file a grievance with the IGO within 30 days of the date that the "[s]ituation or occurrence that is the subject of the grievance took place," unless the grievance is based on an appeal from the ARP or a disciplinary proceeding. Md. Code Regs. §§ 12.07.01.05(A)-(C). Clearly Blake could not appeal from an ARP or disciplinary proceeding; the only complaint he lodged was a report to corrections officers that initiated an IIU investigation. Given that the IIU investigation of Blake's complaint lasted for a
(Continued)

15

Ross argues that the lack of information in the Handbook, Regulations, and Directives should be read to mean Blake had no reason to believe he could not file an ARP request once the IIU had initiated its investigation.[7] But construing the ambiguities against Blake improperly relieves Ross of his burden of proving his affirmative defense. See Jones, 549 U.S. at 211-12, 216. Furthermore, at the summary judgment stage we must draw all reasonable inferences in favor of Blake, the non-movant. See Pueschel, 577 F.3d at 563. The Handbook, Regulations, and Directives do not contradict Blake's belief that he had exhausted his administrative remedies by reporting the incident to senior corrections officers, thereby initiating an IIU investigation.[8] Furthermore, Ross has provided no practical

---

year and was therefore not "exhausted" within 30 days of his encounter, it was certainly reasonable for Blake to believe he could not file a grievance with the IGO.

[7] Alternatively, Ross urges us to affirm the district court on the ground that Ross prevails on the merits. As Blake notes, however, it is typically "more appropriate to allow the district court to consider [alternative grounds for affirmance] in the first instance on remand." Q Int'l Courier, Inc. v. Smoak, 441 F.3d 214, 220 n.3 (4th Cir. 2006); see also McBurney v. Cuccinelli, 616 F.3d 393, 404 (4th Cir. 2010) (declining to address merits of § 1983 claim in the first instance). Therefore, we remand to afford the district court the opportunity to address the merits of Blake's claims.

[8] Blake is not alone in his understanding of the interaction between the ARP and the IIU. In Giano, the Second Circuit found it relevant that "a learned federal district court judge [had] (Continued)

16

examples of an inmate being allowed to file an ARP or IGO grievance during or after an IIU investigation. Blake reasonably interpreted Maryland's murky inmate grievance procedures, and the IIU investigation into his complaint provided the Department with ample notice and opportunity to address internally the issues raised. We therefore hold that

---

not long ago endorsed an interpretation of DOCS regulations nearly identical to Giano's." 380 F.3d at 679. Here, at least three district court judges have found that an internal investigation removes an inmate's complaint from the ARP process. See Thomas v. Bell, No. AW-08-2156, 2010 WL 2779308, at *4 & n.2 (D. Md. July 7, 2010); Williams v. Shearin, No. L-10-1479, 2010 WL 5137820, at *2 n.2 (D. Md. Dec. 10, 2010); Bogues v. McAlpine, No. CCB-11-463, 2011 WL 5974634, at *4 (D. Md. Nov. 28, 2011).

Ross argues that these cases are inapposite because they relied on DCD 185-003, which requires dismissal of an ARP complaint if it shares its basis with an IIU investigation. But at least one of these cases was filed before that directive issued. Thomas, 2010 WL 2779308, at *1 (noting that Thomas filed his complaint on August 18, 2008); see also DCD 185-003 (issued and effective on August 27, 2008). Of the remaining two opinions, only one refers (opaquely) to a dismissal under DCD 185-003. See Bogues, 2011 WL 5974634, at *4 (citing an exhibit to the officer's motion to dismiss). The second such opinion reasons that, although the inmate did not file an ARP complaint, the fact that "prison officials were aware of his concerns, convened an internal investigation, and regularly met to review [the inmate's] classification and security status" was sufficient to satisfy the exhaustion requirement. Williams, 2010 WL 5137820, at *2 n.2. Therefore, even if Ross is correct that Blake could have filed a complaint through the ARP while his IIU investigation was pending, the grievance system is confusing enough that at least two learned judges have reached the opposite conclusion.

17

the district court erred in granting summary judgment to Ross on the basis of his exhaustion defense.

## III.

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for further proceedings.

<u>REVERSED AND REMANDED</u>

AGEE, Circuit Judge, dissenting:

If a prisoner wishes to bring a suit touching on any aspect of "prison life," then he must first exhaust his available administrative remedies. Porter v. Nussle, 534 U.S. 516, 532 (2002); see also 42 U.S.C. § 1997e(a). Although all parties agree that Shaidon Blake's suit concerns prison life, Blake did not avail himself of the very administrative remedy that Maryland designed for this sort of claim -- the Administrative Remedy Procedure ("ARP"). Despite that failure, the majority holds that Blake may proceed with his unexhausted claim in federal court. Because that holding undermines the Prison Litigation Reform Act's ("PLRA") "mandatory" exhaustion requirement, Porter, 534 U.S. at 524, I respectfully dissent, preferring instead to affirm the judgment of the district court dismissing Blake's claim.

I.

Exhaustion is a vital prescription. "What this country needs, Congress [has] decided, is fewer and better prisoner suits." Jones v. Bock, 549 U.S. 199, 203 (2007). Congress designed an "invigorated" exhaustion requirement to achieve that goal. Porter, 534 U.S. at 524. This requirement is a "strict" one, King v. McCarty, 781 F.3d 889, 893 (7th Cir. 2015), compelling a prisoner to use "all available remedies in

19

accordance with the applicable procedural rules," <u>Moore v. Bennette</u>, 517 F.3d 717, 725 (4th Cir. 2008) (citation and internal quotation marks omitted). A prisoner must proceed through the administrative process even if, for instance, he seeks some relief that the process has no power to afford. <u>See</u> <u>Booth v. Churner</u>, 532 U.S. 731, 740-41 (2001).

Blake did not exhaust his available administrative remedies before filing suit. As the majority notes, the relevant administrative processes in Maryland are set out in various statutes, regulations, and Department of Public Safety and Correctional Services directives. According to one such directive, DCD 185-002, inmates housed in Division of Correction facilities must seek relief for "institutionally related" complaints through an ARP complaint. J.A. 405. "Every inmate" may submit a request for an administrative remedy. J.A. 406. Consistent with the directive, the prisoner handbook explains that the process applies to "all types of complaints" that might arise within the prisons, save four categories of claims. J.A. 403. All parties agree that those categories do not apply here, as they concern inmate classification, parole, inmate discipline, and withholding of mail. J.A. 405-06. Furthermore, DCD 185-002 separately and specifically instructs prisoners to use the ARP to "seek relief . . . for issues that include . . . [u]se of force." J.A. 405. One can hardly

20

imagine a plainer provision that more directly applies to Blake's present claim.

Blake must have been aware of these remedies -- he never even hints that he was not. He received the prisoner handbook in May 2007, along with later "oral communication" on "the system for processing complaints regarding institutional matters." J.A. 168, 170. See Wright v. Langford, 562 F. App'x 769, 776 (11th Cir. 2014) (holding that it was reasonable to presume prisoner's awareness of procedures where he received a handbook spelling out those procedures). The same prisoner handbook indicates that full descriptions of the processes were available in the library. J.A. 403. An administrative remedy coordinator was also available to help. J.A. 409.

That is not to say that it would matter whether Blake was ignorant of the procedures. "[An inmate]'s alleged ignorance of the exhaustion requirement, or the fact that he might have misconstrued the language in the handbook, does not excuse his failure to exhaust." Gonzalez v. Crawford, 419 F. App'x 522, 523 (5th Cir. 2011); accord Brock v. Kenton Cnty., Ky., 93 F. App'x 793, 797-98 (6th Cir. 2004). After all, we usually do not accept an inmate's "ignorance of the law" as an excuse for non-compliance in other contexts. United States v. Sosa, 364 F.3d 507, 512 (4th Cir. 2004) (equitable tolling). Even so, the

21

point warrants emphasis because it gives Blake even less reason to complain of any unfairness here.

Blake mistakenly maintains that he was precluded from seeking relief through the ARP simply because a separate unit of the Department of Corrections conducted an internal investigation into another officer involved in the incident that led to this suit. Blake did not initiate that investigation himself. See J.A. 287. Nor did he believe that he was entitled to learn the investigation's results. See J.A. 161. Even so, Blake somehow decided that the investigation and the ARP were effectively one and the same. He never hints that prison officials actively misled him into this understanding. Instead, he came to his conclusion all on his own, having never read the directives explaining the ARP. See J.A. 162-63.

Had Blake read those directives, this case might have proceeded much differently. For nothing in the relevant guidance -- in the prisoner handbook, directives, regulations, statutes, or otherwise -- suggests that an internal investigation bars or replaces an inmate complaint through the ARP. "[T]he prison's requirements," not the prisoner's unjustified speculations, "define the boundaries of proper exhaustion." Jones, 549 U.S. at 218. Because the relevant regulations never mention internal investigations, Blake should not have assumed that such an investigation changed any of the

22

normal rules.  Even more so because Maryland instructed inmates to send most "all" of their complaints through the ARP.

Other courts agree that an inmate does not satisfy the PLRA's exhaustion requirement simply by participating in an internal investigation.  See, e.g., Hubbs v. Cnty. of Suffolk, No. 11-CV-6353(JS)(WDW), 2014 WL 2573393, at *5 (E.D.N.Y. June 9, 2014).  The Ninth Circuit relied on the "literal command of the PLRA" in doing so.  Panaro v. City of N. Las Vegas, 432 F.3d 949, 953 (9th Cir. 2005).  The Sixth Circuit did much the same.  See Thomas v. Woolum, 337 F.3d 720, 734 (6th Cir. 2003), abrogated on other grounds by Woodford v. Ngo, 58 U.S. 81, 87 (2007).  So too did the Seventh Circuit.  See Pavey v. Conley, 663 F.3d 899, 905 (7th Cir. 2011).  These cases and others impliedly recognize that prisoner grievance proceedings and internal investigations serve different and not entirely consistent purposes.  Perhaps just as importantly, the cases acknowledge that prisoners are not "permitted to pick and choose how to present their concerns to prison officials."  Id.

In sum, Blake failed to exhaust "available" "administrative remedies" by failing to file a complaint through the ARP.  42 U.S.C. § 1997e(a).  The internal investigation made no difference.

23

Blake's failure to exhaust also cannot be overlooked merely because he is said to have "reasonably interpreted Maryland's murky inmate grievance procedures." Maj. op. at 16. How could Blake have reasonably interpreted procedures that were available to him but that he never bothered to read?

More to the point, this reasonable-interpretation exception to the PLRA's exhaustion requirement rests on two unsupportable ideas. First, the prisoner's subjective beliefs largely do not matter when determining whether the prisoner exhausted his administrative remedies. See Napier v. Laurel Cnty., Ky., 636 F.3d 218, 221 n.2 (6th Cir. 2011); Thomas v. Parker, 609 F.3d 1114, 1119 (10th Cir. 2010); Twitty v. McCoskey, 226 F. App'x 594, 596 (7th Cir. 2007); Lyon v. Vande Krol, 305 F.3d 806, 809 (8th Cir. 2002) (en banc) ("[Section] 1997e(a) does not permit the court to consider an inmate's merely subjective beliefs, logical or otherwise, in determining whether administrative procedures are 'available.'"). Yet the reasonable-interpretation approach makes such belief the lynchpin of the analysis. And second, substantial compliance and proper exhaustion are not the same. See Thomas, 609 F.3d at 1118; Lewis v. Washington, 300 F.3d 829, 834 (7th Cir. 2002); Wright v. Hollingsworth, 260 F.3d 357, 358 (5th Cir. 2001). Yet the

reasonable-exhaustion exception is substantial compliance by another name.

The PLRA's exhaustion requirement may not even be amenable to any exceptions. The Act requires a prisoner to "us[e] all steps that the agency holds out[] and do[] so properly." Woodford, 548 U.S. at 90 (citation and internal quotation marks omitted). That rather restrictive definition of exhaustion seems inconsistent with ad hoc exceptions like one premised on a prisoner's "reasonable" mistake, where the prisoner has admittedly not used "all steps." Judge-made exceptions may be permissible when interpreting judge-made exhaustion doctrines, see, e.g., Reiter v. Cooper, 507 U.S. 258, 269 (1993), but they hardly seem appropriate where, as here, we are dealing with Congressional text. "Congress is vested with the power to prescribe the basic procedural scheme under which claims may be heard in federal courts," Patsy v. Bd. of Regents of Fla., 457 U.S. 496, 501 (1982), and a "court may not disregard these requirements at its discretion," Hallstrom v. Tillamook Cnty., 493 U.S. 20, 31 (1989). And pragmatic reasons suggest that ad hoc, "belief"-focused exceptions should be avoided, as they force courts to undertake the "time-consuming task" of probing "prisoners' knowledge levels of the grievance process at given points in time." Graham v. Cnty. of Gloucester, Va., 668 F. Supp. 2d 734, 740 (E.D. Va. 2009).

25

A reasonable-interpretation exception might trace back to administrative law, maj. op. at 10, but that offers a questionable pedigree. "[A]lthough courts have read the PLRA to call for administrative-law-style exhaustion, they have not imported the corresponding exceptions." Margo Schlanger, Inmate Litigation, 116 Harv. L. Rev. 1555, 1652 (2003). Certainly at the Supreme-Court level, attempts to engraft exceptions that derive from the "traditional doctrines of administrative exhaustion" onto the PLRA's statutory exhaustion requirement have failed. Booth, 532 U.S. at 741 n.6; see also Woodford, 548 U.S. at 91 n.2 (rejecting the dissent's suggestion to apply an exception to the PLRA exhaustion requirement derived from administrative law). Justice Breyer once suggested a link between administrative law exceptions and the PLRA, see maj. op. at 10, but no majority of justices ever sanctioned that view. Even the Second Circuit, which may have at one time provided perhaps the only precedent supporting a reasonable-interpretation exception, now recognizes that such exceptions may no longer be viable in light of more recent Supreme Court decisions. See Amador v. Andrews, 655 F.3d 89, 102–03 (2d Cir. 2011) (questioning whether a reasonable-interpretation exception survives Woodford and citing several other Second Circuit opinions doing the same).

All that aside, Blake does not meet the standards that evidently apply to this new reasonable-interpretation exception. The majority says that the exception will apply when a prisoner's submissions serve the same "substantive" purposes as proper exhaustion. Maj. op. at 10-11 (emphasis omitted). Furthermore, the prisoner must have been "justified" in believing that he was following the proper procedures. Id. Here, neither proves to be the case.

Blake did not fulfill any of the substantive purposes served by proper exhaustion by involving himself in an internal investigation. That investigation examines employee conduct, not the merits of the inmate's specific grievance. It also is not a means of dispute resolution or settlement, but instead a simple exercise of the institution's role as an employer. And the inmate plays a limited role in the investigation, providing only a factual statement. In contrast, exhaustion is intended to "allow[] prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." Jones, 549 U.S. at 204. It also "reduc[es] litigation to the extent complaints are satisfactorily resolved, and improv[es] litigation that does occur by leading to the preparation of a useful record." Id. at 219.

The internal investigation here did not fulfill these purposes for several reasons. For one thing, the internal

27

investigation focused on the actions of corrections officer James Madigan, who the Department of Public Safety and Correctional Services identified as the only relevant "suspect." J.A. 287. It largely did not examine the actions of the only remaining defendant in this appeal, Michael Ross, and did not offer any opportunity to "resolve" a dispute about Ross' acts. Nor did it produce a useful administrative record, as the internal investigation report largely treats Ross as a peripheral bystander. See J.A. 287-400. Indeed, the few references to Ross largely consist of passing mentions that Blake was "being escorted" by Ross. See, e.g., J.A. 289. Moreover, other evidence that would have been useful in this suit, like a contemporaneous medical examination of Blake, was not gathered during the investigation. Administratively settling Blake's claims was also out of the question, as the internal investigation did not offer direct relief to an inmate. See Pavey, 663 F.3d at 905 ("An internal-affairs investigation may lead to disciplinary proceedings targeting the wayward employee but ordinarily does not offer a remedy to the prisoner who was on the receiving end of the employee's malfeasance."). And, at bottom, it should not be forgotten that Blake failed to file a "targeted complaint," maj. op. at 12, because he failed to file any complaint. He cannot claim credit for "report[ing] the incident," id., as another corrections officer -- Captain

28

James Vincent -- did that.  See J.A. 157-58, 287, 291.  In fact, at one point, Blake actually "request[ed] that no investigation be conducted . . . and that the matter be considered CLOSED." J.A. 398.

It overstates the facts to say that the internal investigation provided "notice of Blake's complaint."  Maj. op. at 12.  The account that Blake provided as part of the internal investigation focused on Madigan, not Ross.  See J.A. 329-33. Thus, Blake did not provide relevant notice of the "source of the perceived problem."  McCollum v. Cal. Dep't of Corr. & Rehab., 647 F.3d 870, 876 (9th Cir. 2011).  And prison officials had no notice that Blake would file a suit premised on anything Ross did, as Blake disclaimed any intent to sue anyone.  See J.A. 332-33 ("I will not be going any further with this situation outside this institution.").  In any event, affording "notice" would not be enough.  "[N]otice to those who might later be sued . . . has not been thought to be one of the leading purposes of the exhaustion requirement."  Jones, 549 U.S. at 219.  Here again, even the Second Circuit recognizes as much.  See Macias v. Zenk, 495 F.3d 37, 44 (2d Cir. 2007) ("[A]fter Woodford, notice alone is insufficient[.]").

Nor did Blake satisfy the "procedural prong" of the exception, which apparently requires the inmate to rely on a "reasonable" "interpretation of the relevant regulations."  Maj.

29

op. at 12.  It hardly bears repeating that the regulations were clear and Blake had no basis to misconstrue them.  This case did not involve inmate discipline, parole, mail, or inmate classification, so Blake's claim was not explicitly excluded from the ARP.  Contrast with Giano v. Goord, 380 F.3d 670, 679 (2d Cir. 2004) (applying the reasonable-interpretation exception where the inmate mistakenly but reasonably believed that his claim fell into a category of claims explicitly excluded from the ordinary grievance process).  The ARP applied to all inmates, to all claims of use of force, at all relevant times. Blake acted unreasonably in purportedly interpreting the regulations otherwise.  Indeed, at least toward the beginning of this case, even Blake seemed to understand that the internal investigation and the ARP were separate.  He explained then that, in his view, the internal investigation made it unnecessary to resort to the ARP.  See J.A. 162-63.  But he never once suggested that the investigation precluded him from filing a complaint.

Furthermore, the relevant procedures were not "ambiguous" merely because they did not specifically describe how an internal investigation might affect a complaint lodged through the ARP.  See maj. op. at 13.  When a policy like the ARP ostensibly reaches "all" complaints, and that same policy says nothing about an entirely separate process, the obvious

30

inference is that the latter process is untethered from the former. But the majority puts aside this clear assumption in favor of an ambiguous approach to prison regulation. Now, jail officials must anticipate every potential misunderstanding that an inmate might have about a prison's administrative remedies and then foreclose every imaginable misunderstanding in writing. That approach imposes a substantial new burden on state corrections officials. It also finds no support in the law. To the contrary, more than one court has held that prison officials are not responsible for telling prisoners anything about the available administrative remedies. See, e.g., Yousef v. Reno, 254 F.3d 1214, 1221 (10th Cir. 2001); cf. Johnson v. Dist. of Columbia, 869 F. Supp. 2d 34, 41 (D.D.C. 2012) ("[T]he majority of courts . . . have held that an inmate's subjective lack of information about his administrative remedies does not excuse a failure to exhaust."). In addition, prison administrators might now feel compelled to adopt overly complicated administrative procedures out of a justifiable fear that any regulatory silence will be used against them. That could in turn produce even more confusion among prisoners.

Prior district court cases also do not render Blake's supposed misunderstanding "reasonable." Maj. op. at 15 n.8. Certainly Blake did not rely on these opinions directly. He could not have, as the opinions do not interpret the policies

31

that applied to Blake's present claim. Rather, all of those cases were looking to a new department directive that went into effect on August 27, 2008, long after the time when Blake needed to file his administrative complaint. See Williams v. Shearin, No. L–10–1479, 2010 WL 5137820, at *2 & n.2 (D. Md. Dec. 10, 2010) (addressing events arising in December 2009); Bogues v. McAlpine, No. CCB-11-463, 2011 WL 5974634, at *4 (D. Md. Nov. 28, 2011) (citing "Ex. 4," an administrative decision that dismissed the inmate's complaint under the 2008 directive); Thomas v. Bell, No. AW–08-2156, 2010 WL 2779308, at *4 n.2 (D. Md. July 7, 2010) (citing an exhibit in another case that proves to be an administrative decision dismissing a complaint under the 2008 policy). The 2008 directive provides that a complaint submitted through the ARP must be dismissed when "the basis of the complaint is the same basis of an investigation under the Internal Investigative Unit." J.A. 437. Of course, the procedure before us here says no such thing, so these district court cases are irrelevant.

In short, a reasonable-interpretation exception does not excuse Blake's failure to exhaust. The district court appropriately declined to apply that kind of an exception here.

III.

One last matter may be easily resolved: Ross did not waive his exhaustion defense by waiting to raise it. Because PLRA exhaustion is an affirmative defense, Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 683 (4th Cir. 2005), it may be waived by a defendant who fails to timely assert it, see, e.g., Ga. Pac. Consumer Prods., LP v. Von Drehle Corp., 710 F.3d 527, 533 (4th Cir. 2013). Here, Ross did not include the exhaustion defense in his initial answer. But he did seek and obtain consent from Blake (through counsel) to file an amended answer containing the affirmative defense. Blake did not condition his consent in any relevant way or even ask to review the proposed answer before it was filed. He cannot now complain about untimeliness when he blindly approved the untimely filing. See Corwin v. Marney, Orton Inv., 843 F.2d 194, 199 (5th Cir. 1988); cf. Mooney v. City of N.Y., 219 F.3d 123, 127 n.2 (2d Cir. 2000) (holding that the plaintiff's implied consent to an amended answer excused the defendant's initial failure to raise an affirmative defense in its answer). The time to object was before the amendment was made. Having failed to do so, Blake was required to face up to Ross' defense on its merits.

IV.

For these many reasons, we should affirm the district court's judgment. Maryland's ARP was available to Blake and he did not use it. We should not now allow his unexhausted claim to go forward. I respectfully dissent from the majority's choice to do otherwise.